**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 09-60-DLB-JGW**

**JOSEPH BREHM**                                                                                   **PLAINTIFF**

**vs.**                                      **MEMORANDUM OPINION & ORDER**

**DENNIS WESSELER, ET AL.**                                                          **DEFENDANTS**

* * * * * * * * *

In this civil rights case brought pursuant to 42 U.S.C. § 1983, Plaintiff Joseph Brehm sues Defendant Police Officers Dennis Wesseler and Kevin Brady alleging a violation of his Fourth Amendment right against wrongful arrest, as well as various state law claims, stemming from his December 26, 2008 arrest for burglary.

This matter is currently before the Court on Defendants' Motion for Summary Judgment. (Doc. # 13). The motion has been fully briefed and is ripe for review. (Docs. # 19, 25). Because Defendant Officers had probable cause to arrest Plaintiff, the Court **grants** Defendants' motion and **dismisses** Plaintiff's § 1983 action. The Court also declines to exercise supplemental jurisdiction over Plaintiff's state law claims and **dismisses** them **without prejudice**.

**I.     FACTUAL BACKGROUND**

In 2005, Plaintiff Joseph Brehm acquired rental property located at 5983 Taylor Mill Road in Covington, Kentucky. (Doc. # 16 at 31). The Taylor Mill property included two residential units, an office space for Plaintiff's bathtub and tile re-glazing business, and a

basement. (Doc. # 16 at 32; 16-1). In 2008, Plaintiff entered negotiations with the Kentucky Transportation Cabinet (KTC) to sell the property to allow for the expansion of Taylor Mill Road. (Doc. # 16 at 31, 36). While Plaintiff was in negotiations, KTC paid the tenants of the Taylor Mill property to vacate; both did by late August or early September of 2008. (Doc. # 16 at 34-37). Plaintiff contracted to sell the Taylor Mill property to KTC in October 2008, and the parties closed in November 2008. (Doc. # 16 at 31, 40).

After the two tenants vacated, but before Plaintiff entered a contract with KTC, Plaintiff advertised the Taylor Mill property for rent. (Doc. # 16 at 103-04). About this time, Rusty and Patty Morgan and their children, acquaintances of one of the former tenants, began living in the Taylor Mill property. (Doc. # 16 at 40-43). Though Plaintiff acknowledges meeting Morgan, he insists he never gave Morgan permission to reside at the Taylor Mill property. (Doc. # 16 at 41-43). Rather, Plaintiff believes that Morgan and his family accessed the property using keys that Plaintiff previously gave him to inspect the property while Plaintiff was still considering renting it (before he entered a sales contract with KTC). (Doc. # 16 at 107). In fact, Plaintiff stated that he was unaware that Morgan and his family had moved into the property until he happened to visit and heard someone at the property; when Plaintiff told Morgan to leave, Morgan responded by verbally and physically threatening him. (Doc. # 16 at 43). The Morgans, by contrast, allege that Plaintiff permitted them to rent the property, even after he closed with KTC, but insisted that rent be paid in cash. (Docs. # 14 at 20-22, 43-44; 15 at 57-60).

Regardless, it is undisputed that when Plaintiff arrived at the Taylor Mill property on December 26, 2008 to retrieve personal items, he knew that the Morgans were living there, the sale had closed, and the property belonged to KTC. (Doc. # 16 at 31-32, 57, 60-61).

Though Plaintiff was accompanied by associates to help him move his personal items, he wanted the police to also accompany him because Morgan had previously threatened him. (Doc. # 16 at 58, 60). Before calling the police, Plaintiff noticed Officer Dennis Wesseler driving by and flagged him down. (Doc. # 16 at 59).

Plaintiff informed Officer Wesseler that he had sold the Taylor Mill property to KTC, his personal property was still in the building, and Morgan and his family were living there and had threatened him on an earlier occasion. (Doc. # 16 at 62). Officer Wesseler asked Plaintiff for proof that he owned the property. (Doc. # 16 at 63). In response, Plaintiff provided keys that opened the office part of the property and a business card for "Home Investor, 101, LLC" which listed the Taylor Mill property as the address. (Doc. # 16 at 63). According to Plaintiff, Officer Wesseler nonetheless permitted him to remove only the bathtubs that were sitting outside the property. (Doc. # 16 at 64-65).

Though Plaintiff is uncertain about what happened next,[1] Officer Wesseler testified that he permitted Plaintiff to remove items from the office part of the property because he could access that area with a key, but prohibited him from accessing the residential unit because he did not have a key and no one answered the door to the residential unit. (Doc. # 18 at 36-37). Officer Wesseler advised Plaintiff that because he no longer owned the property, he would need to look to the court system to establish a right of entry. (Docs. # 16 at 66; 18 at 19). Plaintiff conceded that he was upset about this development; Officer Wesseler characterized Plaintiff as also being "a little bit argumentative." (Docs. # 16 at 67, 72; 18 at 64-65).

---

[1] Plaintiff stated that he "believe[s]" Officer Wesseler then told him to leave because he did not own the property. (Doc. # 16 at 65).

During this discussion, Officer Kevin Brady and Sergeant William Webster arrived on the scene. (Doc. # 18 at 20, 36, 108). Struggling to communicate with Plaintiff, Officer Wesseler conferred with his supervisor, Sergeant Webster, who told him he was handling the matter properly. (Doc. # 18 at 109). It is unclear what, if anything, Sergeant Webster said to Plaintiff. (Docs. # 16 at 67; 18 at 110).

Plaintiff testified that after this conversation concluded, he helped his associates load the bathtubs and garbage cans sitting outside the property into the trailer attached to the van they had arrived in. (Doc. # 16 at 67-68). Plaintiff testified that he then left in his Ford Focus for another property that he owned, where he planned to store the bathtubs. (Doc. # 16 at 68).

After the conversation with Plaintiff ended, Officer Wesseler was dispatched to direct traffic at a gas station approximately one-eighth of a mile away.[2] (Doc. # 18 at 40). About twenty or thirty minutes later, however, Officer Wesseler was dispatched back to the Taylor Mill property because "the residents of that house had called stating that [Plaintiff] had broken into the basement area" and stolen a thermostat. (Doc. # 18 at 19, 41).

When Officer Wesseler arrived back to the Taylor Mill property, he knocked on the front door and Patty Morgan answered. (Doc. # 18 at 43-44). She explained that her son saw Plaintiff go around to the back of the house, take the hinges off the basement door, take the thermostat off the duct work, and begin walking north toward his house. (Doc. #

---

[2] Plaintiff's brief repeatedly states that Officer Wesseler was merely fifty feet away, but provides no citation or evidence in support. (Doc. # 19 at 6). Accordingly, the Court relies on Officer Wesseler's deposition testimony that he was dispatched one-eighth of a mile away. (Doc. # 18 at 19, 40). Regardless, the precise distance is irrelevant as Officer Wesseler unequivocally stated that he could not see the Taylor Mill property from the gas station because there was a building in front of the Taylor Mill property. (Doc. # 18 at 40).

18 at 43-44, 48-49).  Patty Morgan also told Officer Wesseler that she believed Plaintiff took the thermostat to force them to leave because he knew he should not have been renting the Taylor Mill property to them.  (Doc. # 18 at 48-49).

Officer Brady had also returned to the scene by that time.  So Officers Wesseler and Brady, and Patty Morgan's son, walked to the basement and saw that the door had been taken off its hinges and was leaning against the wall.[3]  (Docs. # 18 at 58-60; 17 at 26-27).  They also walked inside the basement and saw exposed wiring, which indicated to Officer Wesseler that "it was a fresh pull, because it was still shinny [sic]."  (Docs. # 18 at 20; 17 at 28).  At that point, Officer Wesseler returned to the front of the house where Plaintiff's two associates remained and asked them where Plaintiff went.  (Doc. # 18 at 62-63).  After some initial hesitation, the two men said that Plaintiff had gone in the back "then he took off down the street."  (Doc. # 18 at 43).  At about this time, Officer Wesseler sent Officer Brady to search for Plaintiff at his residence and bring him back to the scene.  (Doc. # 17 at 29).  Officer Brady went to Plaintiff's house and spoke to his wife who said that Plaintiff was not there; Officer Brady instructed her to contact Plaintiff and have him return to the Taylor Mill property.  (Doc. # 17 at 29-30).

Meanwhile, Officer Wesseler, who remained at the scene, noticed that the van Plaintiff and his associates had loaded the bathtubs into was blocking a driveway and a sidewalk.  (Doc. # 18 at 50).  Officer Wesseler ran the plates to determine who owned the van and, after learning it belonged to Plaintiff, refused to permit Plaintiff's associates to move it.  (Doc. # 18 at 50-52).  Because the van was parked in violation of Covington city

---

[3] The hinges were on the outside, rather than the inside, of the door, which is apparently unusual for an exterior door.  (Doc. # 18 at 60).

ordinances and Plaintiff was not available to move it, Officer Wesseler had the van and trailer towed. (Doc. # 18 at 50-52).

Shortly thereafter, and approximately thirty to forty-five minutes after first leaving the scene, Plaintiff returned. (Doc. # 16 at 72-74). He alleges that he returned because his wife had alerted him that a Covington police officer had visited their home looking for him in connection with a crime that had occurred at the Taylor Mill property. (Doc. # 16 at 69).

Officer Wesseler was taking Patty Morgan's statement in his cruiser when Plaintiff returned. (Doc. # 18 at 66-69). At that point, both Officers Wesseler and Brady approached Plaintiff (Officer Brady had returned from searching for Plaintiff by that point) and explained the situation; Plaintiff denied taking the thermostat. (Doc. # 18 at 71). Officers Wesseler and Brady conferred, after which Officer Wesseler determined that Plaintiff would be arrested for breaking into the basement and stealing the thermostat from a property that he did not own. (Doc. # 18 at 71-72). Officer Brady then told Plaintiff he was under arrest, patted him down, handcuffed him, and put Plaintiff in his cruiser. (Doc. # 18 at 72-73).

Plaintiff testified that while en route to the Kenton County Detention Center he told Officer Brady that the handcuffs were too tight. (Doc. # 16 at 19, 82). Officer Brady does not recall whether Plaintiff complained about the handcuffs, only that his normal procedure is to "slip my finger up under the cuff just to make sure there's room." (Doc. # 17 at 48, 51). Plaintiff nonetheless maintains that he asked Officer Brady to loosen the handcuffs, but he refused to do so, and that as a result Plaintiff had "red marks" on his wrists for approximately four hours after the handcuffs were removed; Plaintiff did not seek medical attention or suffer any permanent injuries. (Doc. # 16 at 17-20).

6

Plaintiff was released on bond about six hours after arriving to the Kenton County Detention Center. (Doc. # 16 at 80). Ultimately, the burglary charges were dismissed with prejudice and the expunged from Plaintiff's record. (Docs. # 16 at 24-26;19-3). It is unclear why the charges were dropped, though Officer Wesseler speculated that the prosecutor did not want to "saddle [Plaintiff] with a burglary charge," given that the Taylor Mill property had been demolished and the Morgans had moved on. (Doc. # 18 at 105-06). Plaintiff commenced this action on May 4, 2009.[4] (Doc. # 1).

## II. ANALYSIS

Rule 56(a) entitles a moving party to summary judgment if that party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(c)(1) further instructs that the "party asserting that a fact cannot be or is genuinely disputed must support the assertion by" citing to the record or "showing that the materials cited do not establish the absence or presence of a genuine dispute." In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

---

[4] Plaintiff's Complaint does not specify whether his claims are brought against Defendant Officers in their individual or official capacities. In *Moore v. City of Harriman*, 272 F.3d 769, 773 (6th Cir. 2001), the Sixth Circuit adopted the rule that "[w]hen a § 1983 plaintiff fails to affirmatively plead capacity in the complaint, we then look to the course of the proceedings to determine" if plaintiff has "clearly notif[ied] defendants of the potential for individual liability." Here, the Complaint suggests that the claims are against Defendant Officers in their individual capacities because it requests compensatory and punitive damages. (Doc. # 1 at 6). Additionally, Defendants have raised qualified immunity as a defense. (Doc. # 13 at 12). Both of these facts indicate that the claims were brought against Defendants in their individual capacities and that Defendants were on notice of this. *See Moore*, 272 F.3d at 772 n.1 (listing factors courts may consider in determining whether a plaintiff's claim is against a defendant in his individual or official capacity). Finally, neither Plaintiff nor Defendants have suggested in any briefings that the claims are against Defendant Officers in their official capacity.

"The moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). The moving party may meet this burden by demonstrating the absence of evidence concerning an essential element of the nonmovant's claim on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, it must produce specific facts showing that a genuine issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). If, after reviewing the record in its entirety, a rational fact finder could not find for the nonmoving party, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

### A.    Section 1983 and Qualified Immunity Standards

For Plaintiff's § 1983 claim to succeed, he must establish a violation of some right guaranteed by the United States Constitution or federal statute by one acting under the color of state law. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005). This is because "[s]ection 1983 does not confer substantive rights but merely provides a

means to vindicate rights conferred by the Constitution or laws of the United States." *Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010). Therefore, the analysis begins by identifying the specific constitutional right allegedly infringed. *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)). Plaintiff's Complaint is not clear about which constitutional or federal provision his § 1983 action is premised upon, so Defendants construed his § 1983 claim to allege unlawful arrest in violation of Plaintiff's Fourth Amendment rights. (Doc. # 13 at 9). Plaintiff's Response does not contest this conclusion but merely opposes Defendants' Motion for Summary Judgment on the merits. Accordingly, the Court will construe Plaintiff's § 1983 action as a claim for wrongful arrest in violation of Plaintiff's Fourth Amendment rights..

Defendants assert that they are entitled to qualified immunity. "In civil damage actions arising out of government officials' performance of discretionary functions, the officials are generally entitled to qualified immunity from suit 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kennedy v. City of Villa Hills, Kentucky*, 635 F.3d 210, 213 (6th Cir. 2011) (internal quotations omitted). "Qualified immunity is intended to serve the public interest by permitting officials to take action with independence and without fear of consequences." *Crocket v. Cumberland Coll.*, 316 F.3d 571, 579 (6th Cir. 2003) (internal quotations omitted). Qualified immunity, therefore, serves as "an *immunity from suit* rather than a mere defense to liability." *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 816 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

In *Saucier v. Katz,* 533 U.S. 194 (2001) the Supreme Court mandated a two step-inquiry in evaluating qualified immunity: "First, a court must decide whether the facts that

a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right." *Pearson,* 129 S.Ct. at 815-16 (citing and describing *Saucier*'s holding). "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* at 816. *Pearson* overruled *Saucier* insofar as courts may now "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 818. *Pearson*, however, did not disturb the substance of the two-prong inquiry, so all pre-*Pearson* case law remains good law. *Jones v. Byrnes*, 585 F.3d 971, 975 (6th Cir. 2009). Though not mandatory, the Court will proceed through the two steps sequentially.

**B.    Defendant Officers did not unlawfully arrest Plaintiff in violation of the Fourth Amendment because they had probable cause that Plaintiff burglarized the Taylor Mill property.**

The first step in the qualified immunity analysis requires the Court to determine whether Plaintiff has shown facts that make out a constitutional violation. In this case, "[a] section 1983 wrongful arrest claimant must prove that the arresting officers lacked probable cause to believe that the suspect had committed the charged crime." *Painter v. Robertson*, 185 F.3d 557, 569 (6th Cir. 1999). "'Probable cause' denotes 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Id.* (quoting *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988)). This inquiry requires the Court to examine the events leading up to the arrest and then to determine "'whether these historical facts,

viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Ultimately, "[t]he quantum of proof required to establish probable cause is significantly lower than that required to establish guilt." *Criss*, 867 F.2d at 262 n.1. Nonetheless, generally "the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995).

"Whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law." *Leonard v. Robinson*, 477 F.3d 347, 354 (6th Cir. 2007) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)). Plaintiff was arrested for burglary (Doc. # 17-1), which is defined by Kentucky Revised Statute (KRS) § 511.030(1): "A person is guilty of burglary in the second degree when, with the intent to commit a crime, he knowingly enters or remains unlawfully in a dwelling." Thus, Defendant Officers had probable cause to arrest Plaintiff if they had probable cause to believe that he (1) unlawfully entered or remained in (2) a dwelling (3) knowing that it was unlawful to do so and (4) with intent to commit a crime. *See Knipp v. Commonwealth*, No. 2003-SC-0039-MR, 2005 WL 387276 (Ky. 2005). The Court will consider each element independently to determine whether the facts known to Defendant Officers would warrant an objectively reasonable officer's belief that Plaintiff had burglarized the Taylor Mill property.

### 1. Defendant Officers had probable cause to believe that Plaintiff had unlawfully entered the Taylor Mill property.

When Defendant Officers arrested Plaintiff, they had probable cause to believe that he had entered the Taylor Mill property and that entry was unlawful. First, based on their

initial encounter, Officer Wesseler knew that Plaintiff wanted to enter the basement and residential rental units, but could not because he did not have keys. (Doc. # 18 at 17-20). In fact, Plaintiff made his desire to enter the property express by asking Officer Wesseler to help him break into the residential area. (Doc. # 18 at 18). When Officer Wesseler refused, Plaintiff became upset. (Doc. # 16 at 67, 72).

Officer Wesseler was subsequently instructed to return to the scene after he received a report that the residents of the Taylor Mill property called the police because Plaintiff had broken into the basement area. (Doc. # 18 at 19, 41). When he arrived, Patty Morgan explained to Officer Wesseler that her son saw Plaintiff go to the back of the house, take the hinges off the basement door, remove the door, take the thermostat off the duct work, and begin walking north toward his house. (Doc. # 18 at 43-44, 48-49). Officer Wesseler then walked to the back of the Taylor Mill property where he saw that the basement door had been removed from its hinges, and exposed wires where the thermostat would have been; these observations corroborated Patty Morgan's statement. (Docs. # 18 at 58-60; 17 at 26-27). In sum, Officer Wesseler had probable cause to believe Plaintiff had entered the basement because (1) Plaintiff expressed an interest in entering when he first met Officer Wesseler; (2) Patty Morgan told Officer Wesseler that her son saw Plaintiff enter the basement; and (3) Officer Wesseler observed physical evidence that corroborated Patty Morgan's statement and indicated that Plaintiff had entered the basement.

Second, Defendant Officers had probable cause to believe this entry was illegal. Officer Wesseler's first interaction with Plaintiff revealed that he had already sold the Taylor Mill property. In fact, Plaintiff showed Officer Wesseler documentation proving that he had

sold the property and no longer owned it. (Doc. # 18 at 18). Further, Plaintiff did not have

keys to access the basement. Lastly, Plaintiff entered the basement by removing the door

from its hinges—even after being told by a police officer that he would need to get

permission to enter through a civil court. These facts, taken in total, establish that

Defendant Officers had probable cause to believe that Plaintiff entered the basement of the

Taylor Mill property and that his entrance was illegal.

> **2.      Defendant Officers had probable cause to believe that the basement of the Taylor Mill property was a dwelling.**

Defendant Officers had probable cause to believe the Taylor Mill property was a

dwelling because Plaintiff told Officer Wesseler that the Morgans lived there. (Docs. # 16

at 62; 18 at 18, 24). When Officer Wesseler returned to the Taylor Mill property after

directing traffic, he knocked on the door and Patty Morgan answered, which confirmed

Plaintiff's statement and provided additional evidence that the property was a dwelling.

Finally, when Defendant Officers entered the basement they saw items such as a washer,

dryer, and "a bunch of their stuff like clothes and things, "all of which indicated that the

basement was part of a dwelling.[5] (Doc. # 18 at 61-62).

> **3.      Defendant Officers had probable cause to believe that Plaintiff knew that it was unlawful to enter the Taylor Mill property.**

Defendant Officers had probable cause to believe that Plaintiff knew it was unlawful

---

[5] Though the probable cause inquiry looks only to the facts that the Officers knew at the time of the arrest, KRS § 511.010(2) defines "dwelling" as "a building which is usually occupied by a person lodging therein." In Kentucky, a basement, even if it can only be reached by going outside a house and entering a separate, locked door, is considered a dwelling because it is part and parcel with the residence. *Stewart v. Commonwealth*, 793 S.W.2d 859, 861 (Ky.App. 1990). The Taylor Mill property satisfied this standard because there were two doors to the basement, one in the back and the other through the kitchen. (Doc. # 16 at 33).

to enter the Taylor Mill property.  As noted above, Plaintiff showed Officer Wesseler documentation proving that he had sold the Taylor Mill property and no longer owned it. Officer Wesseler, in turn, allowed Plaintiff to retrieve his personal property only from those areas that he could access by key.  Office Wesseler also instructed Plaintiff to pursue access to the remainder of the Taylor Mill property through the legal system.  Finally, when Plaintiff did enter the basement, he did so by taking the door off its hinges.  These facts were known to Defendant Officers when they arrested Plaintiff and gave them probable cause to believe that Plaintiff knew it was unlawful to enter the basement of the Taylor Mill property.

### 4. Defendant Officers had probable cause to believe that Plaintiff entered the property with intent to commit a crime.

Finally, when Defendant Officers arrested Plaintiff, they had probable cause to believe that he intended to commit a crime when he entered the basement of the Taylor Mill property.  The Kentucky Supreme Court has explained that although its jurisprudence on this element has ebbed and flowed, it has consistently "required some evidence of intent to commit a crime prior to unlawful entry . . . and the mere fact of the crime is not sufficient." *Commonwealth v. Partee*, 122 S.W.3d 572, 575 (Ky. 2003).  But, as noted above, "[t]he quantum of proof required to establish probable cause is significantly lower than that required to establish guilt."  *Criss*, 867 F.2d at 262 n.1.

The evidence here establishes that when Defendant Officers arrested Plaintiff, they had probable cause to believe that Plaintiff entered the property with intent to commit a crime.  First, based on his initial interaction with Plaintiff, Officer Wesseler knew that Plaintiff wanted to break into the basement and residential area if he was unable to access

these locations any other way. (Doc. # 18 at 18). Plaintiff conceded that he was unhappy when Officer Wesseler refused to help him gain access. Further, when Defendant Officers arrested Plaintiff, they knew that Officer Wesseler had expressly instructed Plaintiff not to enter the basement of the Taylor Mill property, but that Plaintiff had waited until Officer Wesseler left the scene and did so anyhow. These facts confirm Defendant Officers' belief that Plaintiff intended to commit a crime before he entered the basement.

Moreover, when Defendant Officers arrested Plaintiff, they did so believing that Plaintiff had stolen the thermostat from the Taylor Mill property. The thermostat was unlike any of personal property that Plaintiff had asserted ownership over during his initial conversation with Officer Wesseler (i.e., items, such as bathtubs, related to the business Plaintiff ran out of the Taylor Mill property). Instead, the thermostat was affixed to the Taylor Mill property itself, which Officer Wesseler knew Plaintiff no longer owned and was occupied by the Morgans. Thus, although the stolen thermostat may be "the mere fact of the crime" itself—and, per the Kentucky Supreme Court, not evidence of an intent to commit a crime—in this case, the item stolen indicates that Plaintiffs intent in entering the property was to commit a crime (rather than merely enter the property to retrieve personal property). This conclusion is supported by Patty Morgan's statement to Officer Wesseler that she believed Plaintiff took the thermostat to force the Morgans to leave because he knew he should not have been renting the Taylor Mill property to them. (Doc. # 18 at 48-49). Thus, the evidence available to Defendant Officers before arresting Plaintiff gave them probable cause to believe that before entering the basement Plaintiff intended to commit a crime therein.

**5.    Arguments raised by Plaintiff in response to Defendants' Motion for Summary Judgment**

Plaintiff's Response to Defendants' Motion for Summary Judgment relies on his assertion that "Officer Wesseler had actual knowledge that [Plaintiff] had not committed any crime." (Doc. # 19 at 9). In support, Plaintiff points to "many inconsistencies in Defendant Officers' stories." (Doc. # 19 at 5). Unfortunately, Plaintiff's reliance on these purported inconsistencies is misplaced.

First, Plaintiff argues that he was arrested at 12:11 p.m. on December 26, 2008 (Doc. # 19-2 at 2) but it was not until later that evening that Covington police dispatch received a call reporting a theft. (Doc. # 19-2 at 4). Thus, Plaintiff concludes that he "was arrested for burglary prior to the illegal tenant making any call about a missing thermostat." (Doc. # 19 at 6). These facts, however, are not inconsistent in light of the balance of the record, which reveals that at 11:13 a.m. dispatch received a call from Patty Morgan that the "landlord came into the basement, causing trouble." (Doc. # 19-2 at 2). This prompted Officer Wesseler to be dispatched back to the Taylor Mill property where he spoke with Patty Morgan and her son, investigated the physical evidence at the scene, considered his initial interaction with Plaintiff, conferred with Officer Brady, and ultimately concluded that there was probable cause to arrest Plaintiff for burglary. That there was a second call to dispatch reporting a theft at 5:03 p.m. that evening does not undermine Officer Wesseler's on-scene conclusion that probable cause existed; it merely suggests that the Morgans specifically called in the theft of the thermostat later that evening.[6]

_____

[6] Patty Morgan cannot remember whether she called the police again that day. (Doc. # 15 at 66).

Second, Plaintiff observes that "[t]he dispatch log reveals that Defendant Officer Wesseler left the scene at 11:08 and was called back to the scene at 11:15." (Doc. # 19 at 6). Plaintiff suggests that it is not possible to remove the hinges from the door, remove the thermostat from the wall, and walk far enough away to be out of Officer Wesseler's sight in the seven minute span. (Doc. # 19 at 6). Plaintiff also wonders how he was supposedly "able to do this all without being seen by Officer Wesseler who was some fifty feet away." (Doc. # 19 at 6).

The factual foundation for Plaintiff's questions, however, is unsupported by evidence in the record. First, Plaintiff has failed to support his assertion that Officer Wesseler was merely fifty feet away when he was directing traffic. Instead, the only evidence of record is Officer Wesseler's testimony that he was one-eighth of a mile away and could not see the Taylor Mill property from where he was directing traffic. (Doc. # 18 at 40). Additionally, even if Officer Wesseler was close enough to see the Taylor Mill property, he was occupied directing traffic and could not be expected to have simultaneously observed Plaintiff's activities.

Second, lacking any evidence, the Court will not speculate on how long it takes to remove a door from its hinges and a thermostat from the wall. Plaintiff's mere suggestion that seven minutes is not enough time to complete the charged offense does not raise a genuine dispute because (1) Plaintiff does not question the veracity of the dispatch logs; (2) Officer Wesseler testified that before he left the Taylor Mill property the back door was intact (Doc. # 18 at 41); and (3) when Officer Wesseler returned to the scene the back door had been removed (Doc. # # 18 at 58-60).

In sum, Plaintiff's cries of "inconsistencies" are nothing more than baseless assertions and idle musings about how the evidence of record fits together; they do not raise a genuine dispute of material fact. Because the evidence, when viewed in the light most favorable to Plaintiff, reveals that Defendant Officers had probable cause to arrest Plaintiff for burglary, their Motion for Summary Judgment (Doc. # 13) is **granted**.

**C.** **Alternatively, even if Defendant Officers did not have probable cause to arrest Plaintiff, they are entitled to qualified immunity because an officer could reasonably believe that Plaintiff's right to be free from arrest in these circumstances was not clearly established.**

For the sake of thoroughness, the Court assumes *arguendo* that Defendant Officers did not have probable cause to arrest Plaintiff, and therefore moves to the second step of the qualified immunity inquiry. *Byrnes*, 585 F.3d at 978. This step asks whether Plaintiff's constitutional right to be free from wrongful arrest in these circumstances was clearly established such that Defendant Officers should have known of it. *Kennedy*, 635 F.3d at 214. This "clearly established" inquiry considers "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Fettes v. Hendershot*, 375 F.App'x 528, 531 (6th Cir. 2010) (quoting *Saucier*, 533 U.S. at 202).

In the context of a wrongful arrest, "[a]n arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent." *Kennedy*, 635 F.3d at 214 (quoting *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008) *cert denied* 554 U.S. 903 (2008)). Thus, Defendant Officers are entitled to qualified immunity if, after viewing the facts favorably to Plaintiff, an officer reasonably could have believed that the arrest was lawful. By contrast, for Plaintiff to defeat qualified

immunity, his right "must have been 'clearly established' in a . . . particularized . . . sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "General statements of the law are not inherently incapable of giving fair and clear warning," *id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 740-41 (2002)), so long as the unlawfulness of Defendant Officers' actions was apparent. *Id.* (quoting *Anderson*, 483 U.S. at 640).

"In the context of qualified immunity, preexisting, clearly established law refers to 'binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point.'" *Kennedy*, 635 F.3d at 214-15 (quoting *Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2010)). The Sixth Circuit has expressly held that "[a] person who has been the victim of an unlawful arrest or wrongful seizure under the color of law has a claim based on the Fourth Amendment." *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009). Plaintiff thus concludes that Defendant Officers fail the second step of the qualified immunity inquiry because "[t]he right of an arrestee to be free from a wrongful arrest is a clearly established right." (Doc. # 19 at 11). The Court agrees with Plaintiff's basic statement of law, but observes that is unhelpful here. Rather, the question is whether Plaintiff's right to be free from arrest *given the facts of this case* is clearly established, such that a reasonable officer would know that he does not have probable cause to arrest Plaintiff. Plaintiff has cited neither evidence nor case law addressing this question.

As with the first step of the qualified immunity analysis, "whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law."

*Kennedy*, 635 F.3d at 215 (quoting *Leonard*, 477 F.3d at 354). Thus, state law defines the offense for which an officer may arrest a person, while federal law dictates whether probable cause existed for an arrest. *Id.*

As detailed *supra* in Part II.B, Defendant Officers had evidence supporting each of the four elements of burglary, as defined by KRS § 511.030(1), when they arrested Plaintiff. For the same reasons, this evidence was sufficient to "warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown" that Plaintiff had committed the offense of burglary. *Painter*, 185 F.3d at 569 (quoting *Criss,* 867 F.2d at 262). The fact that Defendant Officers conferred before Officer Wesseler decided to arrest Plaintiff is additional evidence that a reasonable officer would believe there was probable cause given the facts of this case. Accordingly, the Court finds that Defendant Officers are entitled to qualified immunity because an officer could reasonably believe that he had probable cause to arrest Plaintiff for burglary and, accordingly, that Plaintiff's right to be free from arrest in these circumstances was not clearly established.

Additionally, Defendant Officers are entitled to qualified immunity even if there was not probable cause to arrest Plaintiff for burglary, so long as the facts in this case would have justified a reasonable officer's belief that he had probable cause to arrest Plaintiff for a related offense. In *Avery v. King*, 110 F.3d 12, 14-15 (6th Cir.1997) the Sixth Circuit found that the defendants were entitled to qualified immunity even though there was no probable cause for the charged offense because there was probable cause for a lesser included offense. Subsequently, the Sixth Circuit clarified that the related offense (i.e., the non-charged offense) need not be a "lesser included" of the charged offense where the facts stated in the arrest and investigation report substantiated the related charge. *Bennett*

*v. Schroeder*, 99 F.App'x 707, 716 (6th Cir. 2004); *see also Calvin v. Irvin*, 286 F.App'x 920, 925 (6th Cir. 2008) (citing *Avery* and stating that even if the defendant officer did not have probable cause to arrest plaintiff for public intoxication, he had probable cause to arrest plaintiff for possession of controlled substances, among other things, which was sufficiently related to the charged offense to entitle the officer to qualified immunity).

This is the case here; Defendant Officers arrested Plaintiff for burglary, but also had probable cause to believe that Plaintiff had engaged in criminal mischief. Kentucky Revised Statute § 512.040(1)(a) states that a person is guilty of criminal mischief when "[h]aving no right to do so or any reasonable ground to believe that he has such right, he intentionally or wantonly defaces, destroys or damages any property." The Court takes these elements in turn.

First, Defendant Officers had probable cause to believe that Plaintiff had no right to damage, destroy, or deface the Taylor Mill property because Plaintiff informed Officer Wesseler that he no longer owned the property and provided supporting documentation. Second, Patty Morgan told Defendant Officers that Plaintiff had removed the basement door from its hinges and taken the thermostat off the duct work; this testimony was corroborated by Defendant Officers' personal observations. That the door was taken off its hinges and the thermostat off the wall gives rise to probable cause that Plaintiff's actions were intentional. Finally, the thermostat was not recovered, the duct work was left with exposed wiring, and the basement door remained off its hinges; these facts establish probable cause that the Taylor Mill property was defaced, destroyed, or damaged. Taken in total, the evidence known to Defendant Officers when they arrested Plaintiff—and recorded in the citation and incident reports (Docs. # 17-1; 17-2)—establish that they had

21

probable cause to arrest Plaintiff for criminal mischief and, accordingly, entitle them to qualified immunity.

**D.    The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, which are therefore dismissed without prejudice.**

In addition to his § 1983 constitutional violation claim, Plaintiff asserts a number of state law claims over which the Court currently has supplemental jurisdiction.  Pursuant to 28 U.S.C. § 1367(c)(3), however, this Court "may decline to exercise supplemental jurisdiction over a claim" if the Court "has dismissed all claims over which it has original jurisdiction."  Where, as here, "the federal claims are dismissed before trial, the state claims generally should be dismissed as well."  *Brooks,* 577 F.3d at 709 (quoting *Wojnicz v. Davis*, 80 F.App'x 382, 384-85 (6th Cir. 2003) (observing that "[u]pon dismissing [plaintiff's] federal claims, the district court properly declined to exercise supplemental jurisdiction over [plaintiff's] remaining state-law claims"); *Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 583 (6th Cir. 2007) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed.") (quoting *Musson Theatrical v. Fed. Express Corp.*, 29 F.3d 1244, 1254-55 (6th Cir. 1996)).

Because Plaintiff's federal claim has now been dismissed, the Court declines to continue exercising supplemental jurisdiction over his state law claims, which are therefore **dismissed without prejudice**.

## III.    CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that,

1.    Defendant Officers' Motion for Summary Judgment (Doc. # 13) is **GRANTED**;

2.    Plaintiff's 42 U.S.C. § 1983 claim for unlawful arrest in violation of the Fourth
Amendment is **DISMISSED**;

3.    Plaintiff's state law claims are **DISMISSED without prejudice**;

4.    This case is **STRICKEN** from the active docket of the Court; and

5.    This is a **FINAL** and **APPEALABLE** Order.

This 4th day of May, 2011.



Signed By:
*David L. Bunning*
United States District Judge